4 P.3d 808 (2000)
141 Wash.2d 245
WASHINGTON STATE REPUBLICAN PARTY, Respondent,
v.
WASHINGTON STATE PUBLIC DISCLOSURE COMMISSION, Gary Maehara, Chair, and Susan Brady, Rhonda Cahill and Ronald Meyers, Commissioners of the Washington State Public Disclosure Commission, in their individual capacities, Melissa Warheit, Executive Director of the Washington State Public Disclosure Commission, in her individual capacity, and Christine Gregoire, Attorney General of the State of Washington, in her individual capacity, Appellants.
State of Washington ex rel. Washington State Public Disclosure Commission, Appellant,
v.
Washington State Republican Party, Respondent.
No. 67442-6.
Supreme Court of Washington, En Banc.
Argued September 23, 1999.
Decided July 27, 2000.
*812 Christine Gregoire, Attorney General, Stephen T. Reinmuth, Asst., Olympia, for Appellants.
John J. White, Jr., Kirkland; Appel & Glueck, William John Glueck, Seattle, for Respondent.
Carney, Badley, Smith & Spellman, James Elliot Lobsenz, Seattle, Amicus Curiae on behalf of American Civil Liberties Union.
Stephen Overstreet, Olympia, Amicus Curiae on behalf of Building Industry Association of Washington. *809 *810
*811 MADSEN, J.
The Washington State Public Disclosure Commission (Commission) appeals a superior court judgment that the Washington State Republican Party (Party) did not violate RCW 42.17.640 when it used exempt funds to purchase a television commercial critical of then candidate Gary Locke prior to the 1996 gubernatorial election. The Commission contends the superior court erred in reading the statute as allowing funds in excess of contribution limits to be used for the political advertisement.
This case arises at a time of tremendous national debate about campaign finance reform, especially around the creation and use of "soft money." Nevertheless, the United States Supreme Court and this court have remained steadfast in protecting the right to full and vigorous discussion of political issues, free from government regulations. We conclude that the advertisement here was issue-oriented, and therefore protected under the free speech clause of the First Amendment. Accordingly, we hold that RCW 42.17.640's limitations on issue-oriented speech are unconstitutional as applied and affirm the trial court.

Facts
In 1992, the voters passed a campaign finance initiative, the Fair Campaign Practices Act. Among other things, one section of the act, RCW 42.17.640, limits contributions to candidates for office and political parties. The limit on contributions to a political party set in the initiative is $2,500 per year, RCW 42.17.640(6), but the Commission adjusts this amount every two years based upon inflation, RCW 42.17.690. As a result of a 1995 amendment, Laws of 1995, ch. 397, § 20, contributions earmarked for certain specified uses are not subject to the contribution limits, specifically "voter registration, for absentee ballot information, for precinct caucuses, for get-out-the-vote campaigns, for precinct judges or inspectors, for sample ballots, or for ballot counting, all without promotion of or political advertising for individual candidates[.]" RCW 42.17.640(14)(a). Further, expenditures for a party's "own internal organization or fund raising without direct association with individual candidates" are also exempt. RCW 42.17.640(14)(b). These "exempt" funds are also known as "soft money."
On October 17, 1996, three weeks prior to the 1996 Washington State gubernatorial election, the Party bought and ran throughout the state a television commercial critical of then gubernatorial candidate Gary Locke. The Party paid for this $150,000 "Tell Gary Locke" ad using exempt funds, or "soft money" it had accepted under RCW 42.17.640(14). Also on October 17, 1996, the Party bought another television ad for $30,000, which was in part identical to the "Tell Gary Locke" ad but ended quite differently. The party paid for this second ad with funds limited under RCW 42.17.640(6), and reported it as an in-kind contribution to the Ellen Craswell gubernatorial campaign.
Both ads began as follows:
What does Gary Locke have to say about crime in our neighborhoods?
When 76 percent of voters said yes to "Three Strikes, You're Out," Gary Locke said no.
When people asked for more cops on the streets in King County, Gary Locke said no.

*813 But Gary Locke said "yes" to a plan which would give self-esteem training to prostitutes and pay for a newsletter for those employed in the "sex industry," a plan so ridiculous that both Republicans and Democrats condemned it.
Clerk's Papers (CP) at 181. The "Tell Gary Locke" ad continued:
Tell Gary Locke that's not what we call getting tough on crime.
Tell Gary Locke that we deserve better.
Paid for by the Washington State Republican Party.
CP at 81. The second ad, reported as an in-kind contribution to the Ellen Craswell campaign, instead concluded:
And now he wants to be our governor?
Gary Locke: another extreme liberal we just can't afford.
Paid for by the Washington State Republican Party.
CP at 187. During the 1996 election cycle, the Party also used exempt funds to buy polls, surveys, and opposition research.
After the election, the Commission's enforcement staff filed a complaint after concluding that the Party had committed a number of violations of state campaign finance laws, including its use of exempt funds to finance both the "Tell Gary Locke" commercial and the surveys and opposition research. On June 23, 1998, the Commission held a hearing on these issues. It found by a vote of 4-0 that the Party violated RCW 42.17.640 by using "soft money" to purchase the advertisement. It referred the apparent violation to the Attorney General for further action under RCW 42.17.400, pursuant to which a more substantial penalty may be sought.[1] By a vote of 2-2, the Commission did not reach a decision on whether the Party violated RCW 42.17.640 by using "soft money" to pay for political surveys and opposition research during the 1996 election cycle.
Before the Attorney General commenced legal action based on the Commission's order, the Party filed a complaint in King County Superior Court, alleging that the Commission's application of RCW 42.17.640 in its enforcement action against the Party violated the Party's civil rights to free speech and association and was unconstitutional. It prayed for relief on this issue in the form of an injunction against further enforcement action and a declaratory judgment that it is permissible under the statute to use exempt funds to buy issue-oriented political advertisements if they do not expressly advocate the election or defeat of a candidate. The complaint also sought judicial review of the Commission's action under the Administrative Procedure Act, chapter 34.05 RCW, and a permanent stay of the Commission's order holding that the "Tell Gary Locke" ad violated the statute. The complaint asked the court to issue a declaratory judgment that it is not a violation of the statute for a political party to use exempt funds to pay for political surveys and opposition research that are only used internally and which are not supplied to any candidate. Finally, the Party sought attorney fees and costs pursuant to RCW 42.17.400(5) and 42 U.S.C. § 1988 (1994).
The Commission filed a counterclaim against the Party, seeking monetary penalties for intentional spending of "soft money" on the "Tell Gary Locke" commercial in violation of RCW 42.17.640.
Both the Commission and the Party moved for summary judgment. On October 7, 1998, the trial court entered an order granting the Party's motion and denying the Commission's motion. The court reasoned that the "Tell Gary Locke" ad was protected political speech under the First Amendment and that if the statute were applied to prohibit the ad, it would be unconstitutional as applied. Instead of striking down the law, the trial court construed the statute to imply an exemption for the protected speech. The court also concluded that the Party was entitled to a declaratory judgment that it could use exempt funds to buy opposition research and polling for internal use, dismissed the State's counterclaim with prejudice, awarded costs and attorney fees to the Party and directed it *814 to file a request for reasonable attorney fees. Thereafter, the Party moved for costs and attorney fees, and on November 25, 1998, the court awarded attorney fees to the Party under RCW 42.17.400(5), but declined to award fees pursuant to 42 U.S.C. § 1988. In a supplemental order entered March 4, 1999, the court limited the fee award under RCW 42.17.400(5) to those fees and costs incurred after the State filed its counterclaim.
The Commission appealed directly to this Court, which granted the motion for direct review. The Party cross-appealed the award of attorney fees.

Analysis
I. Use of Exempt Funds for the "Tell Gary Locke" Advertisement
The Commission contends that the trial court's construction of RCW 42.17.640 permits exempt soft money contributions from organizational donors to be used by a political party for purposes not allowed by the statute, and that the trial court's construction is not necessary to avoid First Amendment prohibitions. The Party maintains that the trial court properly construed the statute to avoid unconstitutionality which would otherwise result if the statute were construed to prohibit use of soft money contributions for issue-oriented political speech.
In reviewing a grant of summary judgment we engage in the same inquiry as the trial court. Monroe v. Soliz, 132 Wash.2d 414, 418, 939 P.2d 205 (1997). Summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). Here, there are no issues of material fact. Construction of a statute is a question of law which is reviewed de novo. Senate Republican Campaign Comm. v. Public Disclosure Comm'n, 133 Wash.2d 229, 237, 943 P.2d 1358 (1997). Where a statute burdens political speech, the burden is on the government to justify the restriction. State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 624, 957 P.2d 691 (1998).
To understand the issues in this case, we first turn to Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the seminal case addressing First Amendment issues implicated by legislation imposing limits on campaign contributions and expenditures.[2] In Buckley, the Court decided numerous challenges to the constitutionality of the Federal Election Campaign Act of 1971 (FECA), and in particular, 1974 amendments to FECA. Major provisions of FECA prohibited individuals from contributing more than $25,000 in a single year or more than $1,000 to any single candidate for an election campaign, and generally prohibited expenditures by individuals and groups in excess of $1,000 a year "`relative to a clearly identified candidate.'" Buckley, 424 U.S. at 13, 96 S.Ct. 612 (quoting former 18 U.S.C. § 608(e) (Supp. IV 1970)). Other provisions limited a candidate's use of family and personal resources, as well as a candidate's overall expenditures in campaigns. Id.
The Court began its analysis by reaffirming First Amendment principles. It then observed that limitations on the amount of money individuals and groups are permitted to spend on political speech during an election campaign
necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication *815 indispensable instruments of effective political speech.
Buckley, 424 U.S. at 19, 96 S.Ct. 612 (footnote omitted).
The Court in Buckley drew a distinction between contributions and expenditures, based upon a "fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his [or her] campaign." Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).
First, the Court addressed the contribution/expenditure distinction in light of freedom of political speech. Viewing the expenditure limitations as substantial rather than merely theoretical restraints on the quantity and diversity of political speech, the Court noted that limitations on expenditures by individuals, groups, campaign organizations and political parties operate to hinder campaigning. Buckley, 424 U.S. at 19-21, 96 S.Ct. 612. The Court stated that "[i]t is clear that a primary effect of the[ ] expenditure limitations [in FECA] is to restrict the quantity of campaign speech by individuals, groups, and candidates. The restrictions, while neutral as to the ideas expressed, limit political expression `at the core of our electoral process and of First Amendment freedoms.'" Id. at 39, 96 S.Ct. 612 (quoting Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)).[3]
In contrast to restrictions on expenditures, restrictions on contributions impose "only a marginal restriction upon the contributor's ability to engage in free communication." Buckley, 424 U.S. at 20-21, 96 S.Ct. 612. While a contribution serves as a general expression of support for the candidate and his or her views, it does not communicate the underlying basis for the support. Id. at 21, 96 S.Ct. 612. A limitation on contributions "involves little direct restraint" on the contributor's political expression because such restrictions permit the symbolic expression of support and have no impact on the contributor's freedom to independently discuss candidates and issues. Id. Further, while a candidate's expenditures of those contributions may result in political debate, that political speech is by someone other than the contributor. Id. Also, the contribution limitations do not foreclose political committees and candidates from aggregating large sums of money to use in campaigning. Id. at 21-22, 96 S.Ct. 612.
Next, the Court addressed the distinction between contributions and expenditures in light of protected associational freedoms. Contributions serve to affiliate an individual with a candidate and to enable like-minded individuals to pool resources to further common political goals, and thus implicate associational freedoms. Id. at 22, 96 S.Ct. 612. However, while FECA's limitations restrict this means of associating with a candidate or committee, the contributor is still free to become a member of any political association and to volunteer in the association's efforts on behalf of a candidate. Id.
Restrictions on expenditures, on the other hand, "preclude[ ] most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association." Id. (quoting NAACP v. State, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488). The Court said that FECA's "constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression `is simultaneously an interference with the freedom of [their] adherents[.]'" Buckley, 424 U.S. at 22, 96 S.Ct. 612 (quoting Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957)).
The Court concluded that while both FECA's contribution and expenditure limitations implicate fundamental First Amendment interests, the expenditure limitations "impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations *816 on financial contributions." Buckley, 424 U.S. at 23, 96 S.Ct. 612. The Court said that the primary First Amendment problem with the limitations on contributions was the restriction on the right of freedom of political association. Id. at 24, 96 S.Ct. 612. Although this is a basic constitutional freedom "`closely allied to freedom of speech'" and lying at the "`foundation of a free society[,]'" and thus subject to "the closest scrutiny[,]" the Court said that "`[n]either the right to associate nor the right to participate in political activities is absolute.'" Id. at 25, 96 S.Ct. 612 (quoting Shelton v. Tucker, 364 U.S. 479, 486, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) and NAACP, 357 U.S. at 460, 78 S.Ct. 1163 and U.S. Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)). The Court continued: "Even a `"significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." Id. at 25, 96 S.Ct. 612 (quoting Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975)).[4]
However, as to expenditures, which involve core political speech, strict scrutiny applies. Buckley, 424 U.S. at 44-45, 96 S.Ct. 612; see McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("[w]hen a law burdens core political speech, we apply `exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest"). This standard applies to political speech concerning election issues as well as to political speech concerning candidates for office, as both are core political speech.
The Court in Buckley then addressed interests advanced by the government and claimed to justify infringement of political speech. The Court rejected two of the proffered governmental interests as insufficiently compelling to justify limitations on large contributions; neither muting the voices of wealthy contributors nor controlling the costs of elections justify restrictions on contributions. Buckley, 424 U.S. at 25-26, 96 S.Ct. 612. However, the government has a compelling interest in preventing the exchange of large financial contributions for political favors from elected officials which may be directly and materially advanced by reasonable contribution limits. Id. at 26-27, 96 S.Ct. 612.[5]
As to expenditures, FECA limited the amounts of independent expenditures "relative to" a candidate. Former 18 U.S.C. § 608(e) (Supp. IV 1970). An independent expenditure is one that is made without coordination or cooperation with a candidate. The Court first found that in order to survive a vagueness challenge," § 608(e)(1) must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Buckley, 424 U.S. at 44, 96 S.Ct. 612. This narrowing construction was necessary because if the limitations applied to issue advocacy, then FECA would unconstitutionally restrict such speech. The Court observed that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues *817 involving legislative proposals and governmental actions." Buckley, 424 U.S. at 42, 96 S.Ct. 612. Accordingly, to avoid vagueness and overbreadth, § 608(e)(1) had to be "limited to communications that include explicit words of advocacy of election or defeat of a candidate[.]" 424 U.S. at 43, 96 S.Ct. 612; see Federal Election Comm'n v. Massachusetts Citizens for Life, 479 U.S. 238, 248-49, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (unanimous Court on this point).[6]
The Court then asked whether, as narrowly construed, the independent expenditure limit violated the First Amendment, concluding that it did. The Court reasoned that the interest of preventing corruption or the appearance of corruption was not compelling enough to justify the independent expenditure limits of $1,000 per individual or group. First, the Court noted, even assuming that large independent expenditures posed dangers of corruption, the restriction on expenditures would not reach all such expenditures because "[s]o long as persons and groups eschew expenditures that in express terms advocate the election or defeat of a clearly identified candidate, they are free to spend as much as they want to promote the candidate and his views." Buckley, 424 U.S. at 45, 96 S.Ct. 612. Second, while the limitation on independent expenditures was defended on the ground that it was necessary to avoid the circumvention of the contribution limits through independent advocacy, the Court pointed out that expenditures that are controlled by or coordinated with a candidate or campaign are treated as contributions under FECA. The additional limitation on independent expenditures was thus not needed to achieve the goal of preventing corruption or the appearance of corruption in government. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." Id. at 47, 96 S.Ct. 612.
The Court rejected as a justifying interest for limiting expenditures the goal of equalizing the relative ability of individuals and groups to influence elections:
[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed "to secure `the widest possible dissemination of information from diverse and antagonistic sources'," and "`to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" ... The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion.
Id. at 48-49, 96 S.Ct. 612 (citations omitted).
In summary, the Court in Buckley approved financial limitations on contributions to candidates, but held unconstitutional the limitations on expenditures by individuals and groups whose expenditures were not coordinated with candidates. Importantly, the Court also distinguished between express advocacy of candidates for election and issue advocacy, rejecting FECA's burdens on First Amendment freedoms where issue advocacy is concerned.
*818 With this background, we turn to the statute at issue here, RCW 42.17.640, part of the Fair Campaign Finances Act of 1992. The findings and concerns leading to enactment of the act are stated in RCW 42.17.610(3): that wealth should not lead to a disproportionate or controlling influence over election of candidates; that more candidates were raising funds from special interest groups, leading to a public perception of improper influence by such groups over the decisions of elected officials; and that because more money was being raised from special interest groups, the public perception was created that "individuals have an insignificant role to play in the political process." The intent of the contribution limits in the act were to "[e]nsure that individuals and interest groups have fair and equal opportunity to influence elective and governmental processes;" to reduce large organization's influence; and to restore public trust. RCW 42.17.620(1).
The contribution limits are set out in RCW 42.17.640.[7] RCW 42.17.640(1) and (3)(a) provide:
(1) No person, other than a bona fide political party or a caucus political committee, may make contributions to a candidate for a state legislative office that in the aggregate exceed five hundred dollars or to a candidate for a state office other than a state legislative office that in the aggregate exceed one thousand dollars for each election in which the candidate is on the ballot or appears as a write-in candidate....
. . . .
(3)(a) Notwithstanding subsection (1) of this section, no bona fide political party or caucus political committee may make contributions to a candidate during an election cycle that in the aggregate exceed (i) fifty cents multiplied by the number of eligible registered voters in the jurisdiction from which the candidate is elected if the contributor is a caucus political committee or the governing body of a state organization, or (ii) twenty-five cents multiplied by the number of registered voters in the jurisdiction from which the candidate is elected if the contributor is a county central committee or a legislative district committee.
. . . .
RCW 42.17.640(6) provides:
Notwithstanding subsections (1) through (4) of this section, no person other than an individual, bona fide political party, or caucus political committee may make contributions reportable under this chapter ... to a bona fide political party that in he aggregate exceed two thousand five hundred dollars in a calendar year....
RCW 42.17.640(14), enacted by the Legislature in 1995, provides:
The following contributions are exempt from the contribution limits of this section:
(a) An expenditure or contribution earmarked for voter registration, for absentee ballot information, for precinct caucuses, for get-out-the-vote campaigns, for precinct judges or inspectors, for sample ballots, or for ballot counting, all without promotion of or political advertising for individual candidates; or
(b) An expenditure by a political committee for its own internal organization or fund raising without direct association with individual candidates.
Laws of 1995, ch. 397, § 20.
Thus, among other things, the statute contains restrictions on contributions to candidates and to political parties, and on contributions from political parties to candidates. The only exceptions to the limits are those listed in RCW 42.17.640(14). Like the federal scheme, in Washington an expenditure which is coordinated with a candidate is by definition a contribution.[8]
The Commission argues that the contribution limits in RCW 42.17.640 are valid under Buckley and that RCW 42.17.640(6) and (14) do not unconstitutionally limit expenditures by a party. The Party claims, however, that *819 the "Tell Gary Locke" advertisement is issue advocacy which cannot be regulated. The trial court agreed with the Party that the ad was issue advocacy.
A conclusion that the advertisement is issue advocacy largely resolves this case, and therefore we first address the Party's claim that the ad is political speech constituting issue advocacy, and then examine the Commission's arguments.
Buckley held that expenditures for issue advocacy were not subject to FECA's regulations, either in the form of dollar limits or reporting (disclosure) requirements. Buckley's holding that issue advocacy is beyond the reach of government regulation was reaffirmed in Massachusetts Citizens for Life, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (unanimous Court on this part of opinion). The Court said in Buckley: "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Buckley, 424 U.S. at 14, 96 S.Ct. 612. The Court observed that campaigns generate issues of public interest, and quoted the lower court opinion:
Public discussion of public issues which are also campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections.
Buckley, 424 U.S. at 42 n. 50, 96 S.Ct. 612 (quoting Buckley v. Valeo, 519 F.2d 821, 875 (D.C.Cir.1975)). The right to speak out at election time is one of the most zealously guarded under the First Amendment. Monitor Patriot Co. v. Roy, 401 U.S. 265, 271-72, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).
Of course, "[s]tates have no greater power to restrain the individual freedoms protected by the First Amendment than does the Congress...." Wallace v. Jaffree, 472 U.S. 38, 48-49, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).
Buckley also explained what independent expenditures constitute "express advocacy": "communications containing express words of advocacy of election or defeat, such as `vote for,' `elect,' `support,' `cast your ballot for,' `Smith for Congress,' `vote against,' `defeat,' `reject.'" Buckley, 424 U.S. at 44 n. 52, 96 S.Ct. 612. As the Court later noted: "Buckley adopted the `express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons." Massachusetts Citizens for Life, 479 U.S. at 249, 107 S.Ct. 616 (unanimous Court on this point). In Massachusetts Citizens for Life, Inc., the Court found such exhortations where a publication urged voters to vote for pro-life candidates, and identified and provided pictures of specific candidates fitting that description. The Court said that "[t]he fact that this message is marginally less direct than `Vote for Smith' does not change its essential nature. The [publication] goes beyond issue discussion to express electoral advocacy." Id.[9]
Since Buckley, other federal courts have also addressed the type of political speech that is beyond the scope of federal regulation. In Federal Election Comm'n v. Christian Action Network, 894 F.Supp. 946, 948 (W.D.Va.1995), aff'd per curiam by 92 F.3d 1178 (4th Cir.1996), the Court of Appeals for the Fourth Circuit adopted the district court's decision that held: "[I]ssue advocacy intended to inform the public about political issues germane to [an] election ... [is] ... fully protected as `political speech' under the First Amendment." The First Circuit has held that government regulation of campaign contributions should not intrude into the public discussion of issues. Maine Right to Life Comm., Inc. v. Federal Election Comm'n, 914 F.Supp. 8, 12, aff'd per curiam by 98 *820 F.3d 1 (1st Cir.1996), cert. denied, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997).
The most important thing to bear in mind when addressing the issue advocacy/express advocacy distinction is that to preserve core First Amendment freedoms, the standard applied is an exacting one, with any doubt about whether a communication is an exhortation to vote for or against a particular candidate to be resolved in favor of the First Amendment freedom to freely discuss issues.
If speakers are not granted wide latitude to disseminate information without government interference, they will "steer far wider of the unlawful zone." Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958), thereby depriving citizens of valuable opinions and information. This danger is especially acute when an official agency of government has been created to scrutinize the content of political expression, for such bureaucracies feed upon speech and almost ineluctably come to view unrestrained expression as a potential "evil" to be tamed, muzzled or sterilized. United States v. National Committee for Impeachment, 469 F.2d 1135, 1142 (2d Cir.1972).
Federal Election Comm'n v. Central Long Island Tax Reform Immediately Comm., 616 F.2d 45, 54-55 (2d Cir.1980) (Kaufman, J., concurring). As one commentator has explained, the express advocacy standard identified in Buckley reflects three concerns: in order to avoid vagueness and a chilling effect on political speech, Buckley requires the definition of election-related speech to be sharply drawn; in order to avoid extensive intrusion into the internal communications of an organization or the mind of an individual to identify intent, the standard focuses on the content of the speech; and, in order to assure that general political speech is not restricted, election-related speech must be narrowly defined, even if to do so results in some election-related speech evading regulation. Richard Briffault, Issue Advocacy: Redrawing the Elections/Politics Line, 77 Tex. L.Rev. 1751, 1754 (1999).
At the heart of this appeal is the question whether the "Tell Gary Locke" ad is issue advocacy. A split in the federal circuits has emerged as to what constitutes issue advocacy. Most circuits adhere to the narrow view of express advocacy identified in Buckley. The Commission urges, however, that if this court reaches the question, we follow the Ninth Circuit's approach in Federal Election Comm'n v. Furgatch, 807 F.2d 857 (9th Cir. 1987). Furgatch modified, to some extent, the standard of Buckley.
In Furgatch, disclosure requirements of FECA were at issue. As noted, Buckley is clear that FECA cannot limit the amounts of independent expenditures, but the Court upheld the reporting and disclaimer requirements of FECA as constituting only minor burdens on individuals making expenditures. The question in Furgatch was whether an advertisement in the 1980 presidential campaign was express advocacy subject to FECA disclosure regulations.
The court in Furgatch did not read the examples of language set out in Buckley to constitute an exclusive list of the language which constitutes pointed exhortations to vote for or against a particular candidate. This conclusion is sound in light of Massachusetts Citizens. Instead, the Ninth Circuit concluded that a communication constitutes express advocacy when it is susceptible of no other reasonable interpretation than as an exhortation to vote for or against a candidate. Furgatch, 807 F.2d at 864. The court explained: First, speech is "express" only if it is unmistakable and unambiguous in its meaning. Second, speech is "advocacy" only when it presents a clear plea for some kind of action. Id. Speech that informs voters about a candidate without a call for action is not express advocacy. Finally, in order to be "express advocacy," the speech must be clear that the action it is calling for is the election or defeat of a candidate. If reasonable minds could differ as to whether the speech calls for a vote for or against a candidate, or calls for some other kind of action, the speech is not express advocacy. Id. at 864-65.
To this extent, Furgatch is generally consistent with Buckley. However, the court in Furgatch departed from Buckley when it concluded that context is relevant to determining whether a communication is express *821 advocacy. Among other things, the court in Furgatch found the timing of an advertisement to be significant. In the court's view, an advertisement critical of a candidate appearing close to an election leaves little doubt that the ad calls for a vote against the candidate.
We disagree with this approach. Buckley intended to protect issue advocacy which discusses and debates issues in the context of an election. Issue advocacy thus does not become express advocacy based upon timing. The right to freely discuss issues in the context of an election, including public issues as they relate to candidates for office, is precisely the kind of issue advocacy the Court recognized was beyond the reach of regulation. The Court explicitly observed that "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." Buckley, 424 U.S. at 42, 96 S.Ct. 612 (emphasis added). See Massachusetts Citizens for Life, 479 U.S. at 249, 107 S.Ct. 616, (unanimous Court on this point) (recognizing that issue advocacy may include "discussion of issues and candidates") (emphasis added). In a recent case involving anonymous issue advocacy, the Court said: "That this advocacy occurred in the heat of a controversial referendum vote only strengthens the protection afforded to [the leafleteer's] expression: Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances where it is least needed." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The most effective political speech respecting issues vis-a-vis candidates may well occur in the thick of the election campaign.
Moreover, Furgatch`s context approach invites too much in the way of regulatory and judicial assessment of the meaning of political speech. Buckley itself was concerned with this problem. The Court in Buckley quoted the following passage as analogous in describing the difficulty and danger in regulating speech based upon its message:
"[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
"Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim."
Buckley, 424 U.S. at 43, 96 S.Ct. 612 (quoting Thomas v. Collins, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Furgatch's context approach simply adds another layer of uncertainty, and is too flexible to be consistent with Buckley. As the First Circuit explained the problem in a similar case: "In our view, trying to discern when issue advocacy in a voter guide crosses the threshold and becomes express advocacy invites just the sort of constitutional questions the Court sought to avoid in adopting the bright-line express advocacy test in Buckley." Faucher v. Federal Election Comm'n, 928 F.2d 468, 472 (1st Cir.1991). Thus, while Furgatch's three-part test itself appears to be consistent with Buckley and its focus on the content of the communication, the context approach departs from the bright-line express advocacy test of Buckley.
Nor, despite the Commission's argument to the contrary, is Furgatch factually indistinguishable from the case before us. In Furgatch, Harvey Furgatch placed and paid for a full-page ad in the Boston Globe one week prior to the 1980 presidential election. The ad was captioned "DON'T LET HIM DO IT," and consisted of numerous criticisms of the character of incumbent President Carter:
DON'T LET HIM DO IT.
The President of the United States continues degrading the electoral process and lessening the prestige of the office.

*822 It was evident months ago when his running mate outrageously suggested Ted Kennedy was unpatriotic. The President remained silent.
And we let him.
It continued when the President himself accused Ronald Reagan of being unpatriotic.
And we let him do it again.
In recent weeks, Carter has tried to buy entire cities, the steel industry, the auto industry, and others with public funds.
We are letting him do it.
He continues to cultivate the fears, not the hopes, of the voting public by suggesting the choice is between "peace and war," "black or white," "north or south," and "Jew vs. Christian." His meanness of spirit is divisive and reckless McCarthyism at its worst. And from a man who once asked, "Why Not the Best?"
It is an attempt to hide his own record, or lack of it. If he succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning.
DON'T LET HIM DO IT.
Furgatch, 807 F.2d at 858 (quoting advertisement).
The FEC brought suit against Furgatch for violating FECA by failing to report his expenditures and for failing to include a disclaimer stating that Furgatch paid for the ad and that it was not authorized by any candidate. The trial court found that the ad did not expressly advocate the defeat of President Carter.
The Ninth Circuit reversed, applying its test for "express advocacy." The court found that reasonable minds could not dispute that the ad urged readers to vote against President Carter. 807 F.2d at 865. The pivotal question, the court said, was what the reader was asked to do by the phrase "DON'T LET HIM DO IT." Although the ad was not clear as to what action it was calling its readers to, the court found that this did not insulate it from the coverage of the statute. The court concluded that the only reasonable action open to readers of the ad was to vote against Carter. The court also noted that the ad could not be characterized as issue-oriented because it directly attacked the character and campaign tactics of a candidate rather than a candidate's stand on the issues. The court also emphasized the timing of the advertisement  a consideration we find inconsistent with Buckley.
Unlike the ad in Furgatch, the "Tell Gary Locke" ad does not attack the candidate's character but rather his stand on criminal law issues. This is important because when a candidate's character and campaign tactics are attacked, the ad may be subject to only one reasonable interpretation: an exhortation to vote against the candidate. When a candidate's stand on the issues is attacked, however, the ad provides the viewer with information on the candidate's stand on the issues, and also suggests any number of responses. For example, if a voter intending to vote for Gary Locke in the gubernatorial election watched the "Tell Gary Locke" commercial, that voter could (1) change his or her vote; or (2) contact Gary Locke to inform him that he or she disagrees with his stance on crime, but cast his or her vote for Gary Locke nonetheless. Alternatively, a viewer might agree with Gary Locke's stance on crime, and could choose to vote for him on the basis of the commercial. So long as the ad does not constitute an exhortation to vote for or against a specific candidate, however, it is not express advocacy.
The Furgatch ad told its readers that if they "let him do it," the country would be burdened with four more years of his leadership. Furgatch, 807 F.2d at 858. It clearly exhorted voters to stop President Carter from being re-elected. The only way to do this was to vote against him. In contrast, a viewer of the "Tell Gary Locke" commercial could decide to vote against Gary Locke in response to the ad based upon the information it provides, but the ad does not unmistakably and unambiguously contain only an exhortation to do so.
We also agree with the district court in Kansans for Life, Inc. v. Gaede, 38 F.Supp.2d 928, 936-37 (D.Kan.1999) which held unconstitutionally vague a definition of express advocacy as "[a] communication which, when viewed as a whole, leads an *823 ordinary person to believe that he or she is being urged to vote for or against a particular candidate for office[.]" The court observed that under this standard, if reasonable minds could differ as to whether a vote was called for, then the message was subject to regulatory disclosure requirements. 38 F.Supp.2d at 937. The court said: "This is contrary to the Buckley Court's constitutionally mandated, narrow, unambiguous and explicit definition of the term for the purposes of the federal campaign finance statute." Id. The question is not whether the "Tell Gary Locke" commercial is susceptible to a reasonable belief it called for a vote against Locke but whether it is susceptible only to an interpretation that it called for such a vote.
The Commission also mistakenly assumes that issue advocacy critical of a candidate is only protected as it relates to the individual's capacity as an elected official and not as a candidate. It argues that by running the ad outside of King County, where Gary Locke was an elected official, the Party was intending to influence the gubernatorial election. The Party admits that it was trying to influence an election, but it was doing so by educating the voters on the candidates' positions on the issues. The Party argues that this is a completely protected form of issue advocacy.
The Party is correct. In Federal Election Comm'n v. Christian Action Network, 894 F.Supp. 946 (W.D.Va.1995), aff'd per curiam 92 F.3d 1178 (4th Cir.1996) (adopting District Court opinion), the court addressed the constitutionality of regulation of a television commercial critical of a candidate's stand on the issues prior to an election. The Christian Action Network commercial, which ran just before the 1992 presidential election, criticized candidates Bill Clinton and Al Gore for their stand on homosexual rights:
Bill Clinton's vision for America includes job quotas for homosexuals, giving homosexuals special civil rights, allowing homosexuals in the armed forces. Al Gore supports homosexual couples' adopting children and becoming foster parents. Is this your vision for a better America? For more information on traditional family values, contact the Christian Action Network.

Id., 894 F.Supp. at 949 n. 4.
The FEC alleged that the Christian Action Network had illegally spent corporate funds "in connection" with a federal election. The district court opinion, which the Fourth Circuit adopted, held that the ad was beyond the reach of permissible regulation. "[I]ssue advocacy intended to inform the public about political issues germane to [an] election ..." is "fully protected as `political speech' under the First Amendment." Christian Action Network, 894 F.Supp. at 948. The fact that the commercial specifically identified Clinton and Gore and was openly hostile did not render the commercial express advocacy, because it lacked the essential content of express advocacy  direct exhortation to the public to vote against them. Id. at 953.
As in Christian Action Network, even though the "Tell Gary Locke" commercial was intended to persuade voters, it is still issue advocacy. The fact that the "Tell Gary Locke" ad was partisan, negative in tone, and appeared prior to the election does not strip it of its First Amendment protection for issue advocacy.
The Commission also argues that in light of the similar commercial that the Party ran at the same time as the "Tell Gary Locke" ad, the Party was clearly calling for a vote against Gary Locke. The Party characterized the second ad as an in-kind contribution to the Ellen Craswell campaign, acknowledging that it called for a vote against Gary Locke. The Commission insists that when compared to each other, both ads call for a vote against Gary Locke and are express advocacy.
There is, however, a critical difference between the two advertisements. The second ad was clearly express advocacy because unlike the "Tell Gary Locke" ad, it explicitly exhorted the hearer to vote against a particular candidate. The ad said with regard to Gary Locke: "And now he wants to be our governor? Gary Locke: another extreme liberal we just can't afford." CP at 187. With this language the second advertisement is susceptible to no other reasonable interpretation than as an exhortation to vote for *824 or against a candidate. See Massachusetts Citizens for Life, 479 U.S. at 249, 107 S.Ct. 616; Furgatch, 807 F.2d at 864. This language in the second ad is unmistakable and unambiguous in its meaning, and presents a clear plea for the listener to take action to defeat candidate Gary Locke. See id. Reasonable minds could not differ as to whether the second ad calls for a vote against Locke.
We hold that the "Tell Gary Locke" advertisement is issue advocacy.
As explained, under Buckley issue advocacy is not subject to regulation, and our conclusion that the advertisement in question is issue advocacy necessarily means that RCW 42.17.640 is unconstitutional insofar as it restricts the expenditure for the ad. However, before further addressing the constitutionality of the statute as it applies to issue advocacy, we turn to the Commission's additional arguments in order to explain more fully why they do not prevail. In brief, the chief difficulty with the arguments is that for the most part they fail to come to grips with the Party's claim and the trial court's decision that the "Tell Gary Locke" advertisement is issue advocacy. The Commission's arguments focus almost entirely on the distinction between contributions and expenditures delineated in Buckley without regard to the nature of the political speech involved.
The Commission argues that the contribution limitations in RCW 42.17.640(6) are narrowly tailored to control the corrupting influence of large organizational contributors, since expenditures for specified operational purposes, which do not have the potential for such corruption, are exempt from the limits under RCW 42.17.640(14). This scheme, the Commission argues, is constitutional under Buckley, because the Party could spend whatever it wished for political advertising, but had to do so from aggregated limited contributions.
The primary problem with this argument is that the effect of RCW 42.17.640(6)'s contribution limitations and RCW 42.17.640(14)'s limited exemptions, if applied to issue advocacy, is to impose limitations on expenditures for issue advocacy  exactly what Buckley forecloses. Contributions received by a political party and expended for issue advocacy are not the sort of contributions which Buckley held could be limited. They are not contributions to a candidate, i.e., not "money contributed to the candidate to be spent on his [or her] campaign." Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (describing contributions as distinguished from expenditures in Buckley). Accordingly, they do not pose the danger of corruption found in Buckley to constitute a sufficient governmental interest to limit contributions by individuals and groups. See also Nixon v. Shrink Missouri Gov't Political Action Comm., 520 U.S. 377, ___, 120 S.Ct. 897, 145 L.Ed.2d 886, 2000 WL 48424, at *8 (2000). The government may not limit contributions where there is no risk of corruption. Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 623, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality) (citing First Nat'l Bank v. Bellotti, 435 U.S. 765, 790, 98 S.Ct. 1407, 1423, 55 L.Ed.2d 707 (1978)); see Colorado Republican, 518 U.S. at 627-30, 116 S.Ct. 2309 (Kennedy, J., concurring in part, dissenting in part) (looking beyond "contribution" label to actual description of contribution in Buckley).
The corruption rationale simply does not apply in the case of contributions and expenditures for issue advocacy, regardless of whether large organizational contributions may be the source of the funds.[10]
*825 Moreover, in similar contexts the courts have consistently upheld the right of organizations to expend funds for issue advocacy, even in cases where expenditures for express advocacy may be prohibited. See, e.g., Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (corporations, which cannot use general treasury funds for independent expenditures expressly advocating the election or defeat of a candidate,[11] can expend such funds for issue advocacy); see also Samuel F. Wright, Clipping the Political Wings of Labor Unions: An Examination of Existing Law and Proposals for Change, 5 Harv. J.L. & Pub. Pol'y 1, 6-7 (1982) (explaining that labor unions may use treasury funds for issue-oriented political communications which do not expressly advocate the election or defeat of a clearly identified candidate, and citing cases). Nor can contributions to associations engaging solely in issue advocacy be limited. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (limitations on contributions to committees formed to support or oppose ballot measure are unconstitutional). There is no justification for limiting the amount of contributions, whether from large organizations or not, which are used for issue advocacy.
Nor is there any danger that constitutional contribution limits will be evaded if political parties use exempt funds for issue advocacy. The Commission maintains that limiting contributions to political parties prevents evasion of limits on direct contributions to candidates. First, any contributions used for issue advocacy are not contributions made to candidates, directly or indirectly. Second, the case the Commission primarily relies on in support of its argument, California Med. Ass'n v. Federal Election Comm'n, 641 F.2d 619 (9th Cir.1980), is inapposite. That case involved the question whether limits on contributions to multicandidate political committees were constitutional. The relevant opinion in the case is that of the United States Supreme Court which granted review. California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). As the Court's plurality opinion reveals, the case is distinguishable because multi-candidate political committees by definition are distinct legal entities which receive funds from at least 50 contributors and make contributions to at least 5 candidates. 453 U.S. at 197 n. 17, 101 S.Ct. 2712. The Court clearly related the limitation on contributions to multicandidate political committees to direct contributions to candidates (which may constitutionally be limited) in light of the candidacy of particular candidates, and noted that individuals and associations could evade the limit on contributions to candidates if they could give unlimited amounts to multicandidate political committees. Id., 453 U.S. at 197-98, 101 S.Ct. 2712. Focusing the Court's holding, the concurring opinion stressed that by definition multi-candidate political committees are essentially conduits for contributions to candidates, and thus are contributions which accordingly pose the same threat of corruption as direct contributions. Id. at 203, 101 S.Ct. 2712 (Blackmun, J., concurring in part).
When a political party makes expenditures for issue advocacy the threat of corruption *826 posed by direct contributions to candidates is absent. By the same token, use of contributions for issue advocacy does not circumvent constitutional limitations on contributions to candidates.
Nor does the fact that a political party is the speaker expending funds for issue advocacy mean that issue advocacy may be regulated. "The independent expression of a political party's views is `core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees." Colorado Republican, 518 U.S. at 616, 116 S.Ct. 2309 (plurality); see id. at 626-31, 116 S.Ct. 2309 (Kennedy, J., concurring in part, dissenting in part). Further, the Court observed, it was "not aware of any special dangers of corruption associated with political parties that tip the constitutional balance in a different direction." Id. at 616, 116 S.Ct. 2309 (plurality) (in context of independent expenditures); see id. at 626-31, 116 S.Ct. 2309 (Kennedy, J., concurring in part, dissenting in part).
And, unlike the symbolic speech embodied in contributions to candidates for office, issue advocacy is direct political speech which may be made more effective through association. The voices of many may be amplified by exercising the right to engage in unrestricted issue advocacy through association with a political party. The Court in Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492, recognized the importance of associative rights where issue advocacy is concerned. The case involved an ordinance limiting contributions to committees formed to support or oppose ballot measures submitted to popular vote. The Court held that the ordinance unconstitutionally restricted the right of association, and noted that "[t]o place ... a[ny] limit ... on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association." 454 U.S. at 296, 102 S.Ct. 434. The Court distinguished contributions to candidates, which can be limited because of the danger of quid pro quo corruption. 454 U.S. at 296-98, 102 S.Ct. 434.
Similarly, the ability to join together for purposes of issue advocacy through a political party is an important aspect of political speech, especially given the role which political parties can play:
In a country of diverse views and competing interests, political parties can enable citizens to agree on a common agenda for governing. The American "winner-take-all" rule in congressional races encourages parties to appeal to a majority of voters in each district and thus enables the electorate to transcend the parochial interests of PACs and voluntary associations, which are usually united by self-interest, narrow ideologies, or particular issues.... With a formal separation of powers between co-equal branches of the national government and a division of sovereign authority between the states and the federal government, political parties can provide the link that voters need to implement a coherent strategy for governing.
Note, Political Party Expenditures, 110 Harv. L.Rev. 236, 242-43 (1996) (citations omitted); see also James Bopp, Jr., Constitutional Limits on Campaign Contribution Limits, 11 Regent U.L.Rev. 235, 295 (1999) (among other things, parties promote agreement between different interests and groups and promote effective government).
As we have recognized, many of the Commission's arguments fail to address the issue advocacy-express advocacy distinction drawn in Buckley. We have explained why, in the context of issue advocacy, the arguments are unavailing.[12] We add that it *827 must be kept in mind that political speech cannot be limited in order to avoid the influence of wealth, or to "level the playing field."[13]
Because the "Tell Gary Locke" advertisement is issue advocacy, RCW 42.17.640 is unconstitutional if it regulates the expenditure for the advertisement. The trial court, however, recognized an implied exemption for issue advocacy in RCW 42.17.640 in order to save the statute from being declared unconstitutional.
RCW 42.17.640 was enacted through the initiative process, and the exemptions were added by legislative amendment. In determining the intent of exemptions contained in a statute enacted through the initiative process, we apply the same rules of statutory construction which apply generally. Limstrom v. Ladenburg, 136 Wash.2d 595, 606, 963 P.2d 869 (1998); see Senate Republican Campaign Comm. v. Public Disclosure Comm'n, 133 Wash.2d 229, 241, 943 P.2d 1358 (1997). Where possible, statutes should be construed so as to avoid unconstitutionality. Duskin v. Carlson, 136 Wash.2d 550, 557, 965 P.2d 611 (1998); City of Seattle v. Montana, 129 Wash.2d 583, 590, 919 P.2d 1218 (1996).
RCW 42.17.640(14) quite clearly and plainly lists specific exemptions from the contribution limits but does not list issue advocacy as exempt. Where a statute specifically lists the things upon which it operates, there is a presumption that the legislating body intended all omissions, i.e., the rule of expressio unius est exclusio alterius applies. In re Personal Restraint of Hopkins, 137 Wash.2d 897, 901, 976 P.2d 616 (1999). Under this rule, the presumption is that RCW 42.17.640 does not contain an exemption for issue advocacy.
In seeking to persuade this court to affirm the trial court's holding, however, the Party offers two arguments for preserving the statute's constitutionality and leaving intact the trial court's ruling that the Party did not violate the statute. It first argues that the rule of expressio unius est exclusio alterius does not apply to constitutional interpretation, Swanson v. White, 83 Wash.2d 175, 183, 517 P.2d 959 (1973). Instead, the Party urges, the favored approach is for the court to imply an exemption to preserve a statute's constitutionality.
The Party misreads Swanson. In Swanson, the court read an exemption into the landlord lien statute in order to save the statute's constitutionality. The court first recognized that statutes should be interpreted *828 to preserve constitutionality where possible. Id. at 183, 517 P.2d 959. The court then recited the rule of expressio unius est exclusio alterius, noting that at first glance it would seem the rule would exclude any implied exemption. Id. However, the court did not apply the rule, not, as the Party argues, merely because constitutional interpretation was at issue, but largely because of "strongly manifested" legislative intent found elsewhere in the statute favoring the implied exemption. Id.
Moreover, when construing a statute to eliminate its constitutional deficiencies, "a court may not strain to interpret the statute as constitutional: a plain reading must make the interpretation reasonable." Soundgarden v. Eikenberry, 123 Wash.2d 750, 757, 871 P.2d 1050, 30 A.L.R.5th 869 (1994). There is nothing in the plain language of the statute that would serve as grounds to imply an exemption for issue advocacy. The Washington statute provides a blanket restriction on campaign finance, and creates only a handful of exemptions. RCW 42.17.640(6) and (14) are specifically designed to limit the use of money for all but a few purposes. To imply an exemption for issue advocacy would be a strain. Accordingly, we will not read an implied exemption into RCW 42.17.640(14) for issue advocacy.
The Party urges, alternatively, that the constitutionality of RCW 42.17.640(14) can be preserved by taking the same approach the Court took in Buckley when it narrowly construed FECA's language regulating independent expenditures in order to avoid the vagueness and overbreadth problems which would otherwise arise if issue advocacy were regulated. The Party argues that this Court can similarly interpret the phrases "election campaign," and "for the purpose of assisting, benefiting, or honoring any public official or candidate," found in the definitions section of the law, RCW 42.17.020(17) and (19), to apply only to expenditures for express advocacy.
There are two problems with this argument. First, the defined term, "election campaign," does not appear in RCW 42.17.640(6) or (14). In addition, the definition of "expenditure," uses the language "for the purpose of assisting, benefiting, or honoring any public official or candidate," as only one of the ways to define expenditure. RCW 42.17.020(19) also defines expenditure as a payment or contribution, with no reference to a candidate. It would be disingenuous to construe these definitions to only apply to express advocacy. Second, the Buckley Court's interpretation of FECA's language was not as dramatic as what the Party asks this court to do. FECA limited expenditures "for the purpose of influencing" any election, and in Buckley the Court interpreted that to mean expressly advocating the election or defeat of a particular candidate. By contrast, the Party is asking this court to transplant an ambitious interpretation of language that is not even present in the relevant provisions.
Together, RCW 42.17.640(6) and (14) unconstitutionally restrict issue-oriented political speech. Accordingly, RCW 42.17.640(6) and (14) are unconstitutional as applied to issue advocacy.[14]
The Commission argues, though, that if RCW 42.17.640(14) is unconstitutional as applied, then it should be severed from RCW 42.17.640(6) in light of RCW 42.17.962's severability provisions. In the Commission's view, if RCW 42.17.640(14) is invalid as applied, and severed as directed by RCW 42.17.962, then organizational donors would be limited to the contributions allowed by RCW 42.17.640(6) and no additional amounts would be authorized for any purpose. This, the Commission reasons, is an absurd result.
The Commission's argument is not persuasive. RCW 42.17.962 does provide that if a provision of the 1995 revisions to the public *829 disclosure laws (including RCW 42.17.640(14)) is unconstitutional as applied, the remainder of the act is not affected. However, the unconstitutionality in the statute results both from limitations on contributions for issue-oriented political speech and the prohibition on exempt expenditures for such speech. Moreover, the voters enacting RCW 42.17.640(6) did not intend that issue-oriented speech be limited. RCW 42.17.610 expresses the voters' concern with controlling the effect of contributions on candidates, not limiting discussion of political issues. Finally, the "absurd result" identified by the Commission does not occur if both sections are invalidated as applied to issue advocacy.
II. Declaratory Judgment that Exempt Funds May Be Used to Buy Polls, Surveys and Opposition Research
The Commission argues that the trial court lacked subject matter jurisdiction to issue a declaratory judgment that the Party can use exempt funds to pay for polls, surveys and political research. Specifically, the Commission argues that the declaratory judgment was inappropriate because there was no justiciable controversy before the court.
The Commission did not take any action against the Party on this issue, as it failed to come to a decision as to whether the statute had been violated. On its cross-claim against the Party, the Commission did not allege a violation for using "soft money" to buy polls and opposition research.
To invoke the Uniform Declaratory Judgments Act, RCW 7.24.120, there must be a justiciable controversy, unless there is an issue of major public importance. Washington State Coalition for the Homeless v. Department of Soc. & Health Servs., 133 Wash.2d 894, 917, 949 P.2d 1291 (1997). A justiciable controversy, for the purposes of issuing a declaratory judgment, is
"`(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.'"
Id. at 917, 949 P.2d 1291 (citing Nollette v. Christianson, 115 Wash.2d 594, 599, 800 P.2d 359 (1990) (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wash.2d 811, 815, 514 P.2d 137 (1973))).
Here, there was no justifiable controversy on which to issue a declaratory judgment. The disagreement over the use of exempt funds to buy polls and opposition research existed only with the Commission's enforcement staff. The Commission itself failed to take action or declare that the buying of polls and opposition research violated the statute.
The Party relies, however, on Senate Republican Campaign Comm. v. Public Disclosure Comm'n, 133 Wash.2d 229, 943 P.2d 1358 (1997), for the proposition that investigation of a violation of the campaign finance laws indicates a true controversy, and reasons that it follows that a matter which has been the subject of a hearing and resulted in a deadlock also shows a true controversy. The Party misrepresents Senate Republican. Although the committee in that case filed a declaratory judgment action in response to a Commission investigation into whether the committee had violated certain campaign finance laws, the superior court ultimately dismissed that action. This court's opinion does not address the propriety of a declaratory judgment at all.
Further, we do not find the existence of an issue of major public importance warranting a declaratory judgment. See Coalition for the Homeless, 133 Wash.2d at 917, 949 P.2d 1291 (describing issues which are of sufficient importance, such as matters directly affecting the freedom of choice in the election process and the constitutionality of a statute increasing the amount of excise tax).
We hold that the trial court lacked jurisdiction to issue a declaratory judgment.
III. Attorney Fees
In its complaint, the Party alleged a violation of 42 U.S.C. § 1983, asserting that *830 members of the Commission and its executive director, acting in their individual capacities under color of state law, violated the First Amendment rights of freedom of speech and of association of the Party and citizens composing the Party. The Party sought costs and attorney fees pursuant to 42 U.S.C. § 1988, as well as pursuant to RCW 42.17.400(5).[15] The trial court concluded that a violation of the Party's First Amendment rights had occurred. However, while the trial court awarded attorney fees to the Party under RCW 42.17.400(5), it declined to award attorney fees under 42 U.S.C. § 1988. As a result, the court did not award attorney fees and costs which the Party incurred before the Commission filed its counterclaim. The Party maintains that it is entitled to attorney fees and costs under § 1988, and thus for the period before the Commission filed its counterclaim.
Violations of the federal constitution may be remedied under § 1983.[16] However, suit may not be brought under § 1983 in state court against the state or against a state official acting in an official capacity because a state is not a "person" subject to suit within the meaning of § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66-67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).[17] Suit may be brought under § 1983, though, against government officials in their individual capacities for actions taken under color of state law, Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), as the Party's complaint alleges in this case.
Even where a government official is alleged to have violated federal constitutional rights under color of state law, various immunity defenses may be raised. Absolute immunity is available to some defendants, for example, absolute judicial immunity, see Pierson v. Ray, 386 U.S. 547, 554-55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and absolute legislative immunity, see Tenney v. Brandhove, 341 U.S. 367, 376-79, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Qualified immunity may also be raised as a defense. Under this doctrine, public employees performing discretionary functions are entitled to immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (whether official may be personally liable generally turns on the objective legal reasonableness of the action in light of rules which were clearly established at the time the action was taken); see, e.g., Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 1696-97 143 L.Ed.2d 818 (1999) (finding qualified immunity under § 1988 for state officials). Here, the Commission claimed that one of the defendants is qualifiedly immune while the others enjoy absolute quasi-judicial and prosecutorial immunity. The trial court did not rule on the immunity defenses raised by the Commission.
Attorney fees may be awarded in § 1983 actions. The Civil Rights Attorney's *831 Fees Awards Act of 1976, Pub.L. No. 94-559, 90 Stat. 2641, as set forth in 42 U.S.C. § 1988 states: "In any action or proceeding to enforce a provision of section[ ] ... 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." However, the discretion afforded is limited. A prevailing party "`should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Blanchard v. Bergeron, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (quoting Newman v. Piggie Park Enter., Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (other citations omitted)); Collier v. City of Tacoma, 121 Wash.2d 737, 762, 854 P.2d 1046 (1993).
The trial court found several special circumstances which it concluded would render an award under § 1988 unjust: (1) the deterrent effect adequately presented by the attorney's fee award under RCW 42.17.400(5); (2) no further award was needed to assure access to the judicial process by others; (3) the legislation at issue was adopted by a voter's initiative; (4) this case was of first impression in this state's courts; and, (5) the individual defendants' actions have not, under the circumstances, been so unreasonable and contrived that fees should be awarded under § 1988. We conclude the reasons listed by the trial court do not constitute special circumstances rendering an award of attorney fees unjust under these facts.
When enacting § 1988, Congress intended to facilitate actions for enforcement of civil rights:
All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.
In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.
S.Rep. No. 94-1011, 94th Cong., 2nd Sess., reprinted in 1976 U.S.Code Cong. & Admin. News 5908, 5910.
The first circumstance identified by the trial court is that the award under RCW 42.17.400(5) already serves a deterrent effect. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Section 1988 also serves as a deterrent; however, its chief purpose is to enable enforcement actions so that those whose rights are violated may obtain meaningful redress. Recovery of costs is intended. Here, the trial court's award under RCW 42.17.400(5) does not encompass the period before the Commission filed its counterclaim. Where, as in this case, fees awarded on an alternative basis do not make the plaintiff whole insofar as costs of vindicating constitutional rights are concerned, any deterrent effect of the alternative recovery is not a special circumstance rendering an award of attorney fees unjust under § 1988.
The second circumstance identified by the trial court is that an award under § 1988 is unnecessary to assure access to the judicial process by others. "The purpose of § 1988 is to ensure `effective access to the judicial process' for persons with civil rights grievances. H.R.Rep. No. 94-1558, p.1 (1976)." Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). While assurance of access for all is a goal of § 1988, the provision is clearly aimed at enabling plaintiffs to proceed to court to enforce their own constitutional rights. The second reason for denying fees is not a special circumstance justifying denial.
The third circumstance is the fact that RCW 42.17.640 is part of a voter passed initiative, Initiative 134. The need to vindicate violations of constitutional rights does not vary depending upon whether the Legislature or the people acting in a legislative capacity enact the law. While it is possible that any deterrent effect of § 1988 may be *832 less where voter passed initiatives are concerned, deterrence is not the main goal of § 1988; the main purpose of the provision is to enable plaintiffs to enforce their constitutional rights.
The fourth circumstance identified by the trial court is that this is a case of first impression in Washington. Constitutional rights may not be violated with impunity and then attorney fees denied based on the fact that the issue has never arisen in state court. Buckley was decided over 20 years ago, providing that issue advocacy is not subject to government regulation. Numerous federal decisions address issue advocacy. Further, the bringing of cases of first impression in this state helps safeguard the constitutional rights of the plaintiffs, as well as those of others, serving fundamental goals of §§ 1983 and 1988.
Finally, the trial court said the defendants' actions have not been so unreasonable and contrived as to justify an award under § 1988. This circumstance confuses the standard for awarding attorney fees to successful plaintiffs under § 1988 and those for awarding fees to successful defendants. As noted, fees should be awarded to plaintiffs unless there are special circumstances rendering an award unjust. Where defendants are the prevailing parties, however, the court may, in its discretion, award fees based upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation. See Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (addressing attorney fee awards under 42 U.S.C. § 2000e-5(k) (Civil Rights Act of 1964 as amended)); Hensley, 461 U.S. at 433 n. 7, 103 S.Ct. 1933 (standard for awarding fees under 42 U.S.C. § 2000e-k(5) and 42 U.S.C. § 1988 are identical); Tonti v. Petropoulous, 656 F.2d 212, 217 (6th Cir.1981) (plaintiff's action found to be "contrived, frivolous, unreasonable, and without foundation"); Goldrich, Kest & Stern v. City of San Fernando, 617 F.Supp. 557, 561-63 (C.D.Cal. 1985). Where a plaintiff is a prevailing party, the Christiansburg standard does not apply; the policy reasons favoring an award in the case of a prevailing plaintiff do not apply in the case of a prevailing defendant. And, while the trial court's fifth circumstance is not exactly a standard of good faith, it is akin to a finding that because defendants did not act in bad faith, attorney fees should not be awarded. This court has held, though, that the good or bad faith of the defendants is irrelevant to a § 1988 award, and is not a special circumstance rendering an award unjust. Brower v. Wells, 103 Wash.2d 96, 107, 690 P.2d 1144 (1984); Jacobsen v. City of Seattle, 98 Wash.2d 668, 675-76, 658 P.2d 653 (1983).
The reasons given for a denial of fees under § 1988 are not special circumstances rendering an award of fees unjust, and the trial court abused its discretion in denying fees on that basis. As noted, the trial court has yet to rule on the immunity defenses claimed by the Commission. Accordingly, this matter is remanded for determination of whether attorney fees should be awarded under § 1988.
The Party requests attorney fees on appeal. Because the trial court has not determined whether an award under § 1988 is appropriate, the question of any award under that provision would have to abide the decision on remand. However, we award attorney fees to the party for this appeal pursuant to RCW 42.17.400(5). See State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 632, 957 P.2d 691 (1998).

Conclusion
We affirm the trial court's holding that the advertisement in question is issue-oriented political speech which is not subject to governmental regulation. RCW 42.17.640 does not contain an exemption for issue-oriented speech, and RCW 42.17.640(6) and (14) are therefore unconstitutional as applied to such speech. We reverse the trial court's ruling that special circumstances exist which would render an attorney fees award under 42 U.S.C. § 1988 unjust, and remand for a determination of whether the Party is otherwise entitled to attorney fees and costs under § 1988.
GUY, C.J., SMITH, JOHNSON and ALEXANDER, JJ., concur.
*833 SANDERS, J. (concurring).
Although I concur in the opinion of the majority, the Washington State Republican Party's (Party) entitlement to an award of reasonable attorney fees under 42 U.S.C. § 1988 on remand is more nuanced than the run-of-the-mill damage action maintained under 42 U.S.C. § 1983. In this regard I note that the Party has successfully challenged a state statute on First Amendment grounds, thus obtaining prospective relief. And I also note while the defendants have been sued "in their individual capacities" Clerk's Papers (CP) at 5, they undertook to enforce this state statute in their official capacity as well. These distinctions may make a difference on remand.
For example, "the only immunities available to the defendant in an official capacity action are those that the governmental entity possesses," Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), whereas no qualified immunity defense is available in such an action. Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).
Moreover, "[t]he legislative history of the statute [42 U.S.C § 1983] confirms Congress' intent that an attorney's fee award be available even when damages would be barred or limited by `immunity doctrines and special defenses, available only to public officials.' H.R.Rep. No. 94-1558, p. 9 (1976)." Pulliam v. Allen, 466 U.S. 522, 543, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), superseded by statute as to judicial immunity in Kampfer v. Scullin, 989 F.Supp. 194 (N.D.N.Y.1997). And, "`[A] state official in his or her official capacity, when sued for injunctive relief, [is] a person under § 1983....'" Hafer, 502 U.S. at 27, 112 S.Ct. 358 (quoting Graham, 473 U.S. at 167 n. 14, 105 S.Ct. 3099).
Therefore the trial court must consider not only whether qualified immunity is available to these defendants but whether, even if so, it is a defense to an award of reasonable attorney fees where prospective relief has been granted against performance of one's official duties.
TALMADGE, J. (dissenting).
Today the majority finds unconstitutional another portion of voter-approved Initiative 134. It does so even in the absence of a request by the litigants to do so. The effect of the majority's decision is to authorize the raising of unlimited "soft money" by political parties to be spent for whatever purpose those political parties choose so long as it fits the majority's loose definition of issue advocacy. This subverts Initiative 134's contribution limitations. Because the advertisements run by the Washington State Republican Party (WSRP) are arguably candidate advocacy, I would reverse the trial court's summary judgment and leave for trial the issue of whether the WSRP violated the statute limiting contributions to political parties.
The majority correctly recites the facts of this case. The essential purpose of Initiative 134,[1] as enacted by the people by an overwhelming vote of 1,549,297 to 576,161 (73 percent to 27 percent), Laws of 1993, ch. 462, at 1861, was to alter the way political campaigns in Washington were funded. The people stated their concern about the campaign process as follows:
(1) The financial strength of certain individuals or organizations should not permit them to exercise a disproportionate or controlling influence on the election of candidates.
(2) Rapidly increasing political campaign costs have led many candidates to raise larger percentages of money from special interests with a specific financial stake in matters before state government. This has caused the public perception that decisions of elected officials are being improperly influenced by monetary contributions.
(3) Candidates are raising less money in small contributions from individuals and more money from special interests. This has created the public perception that individuals *834 have an insignificant role to play in the political process.
RCW 42.17.610. The principal thrust of Initiative 134 was to limit contributions to candidates and political parties. The people articulated the purpose of such limitations in RCW 42.17.620:
By limiting campaign contributions, the people intend to:
(1) Ensure that individuals and interest groups have fair and equal opportunity to influence elective and governmental processes;
(2) Reduce the influence of large organizational contributors; and
(3) Restore public trust in governmental institutions and the electoral process.
Initiative 134 curtailed contributions to candidates and political committees, RCW 42.17.640(1) through (4); it also imposed limits on organizational contributions to political parties and to caucus political parties. RCW 42.17.640(6). However, the people exempted from the contribution limit of RCW 42.17.640(6) certain kinds of contributions to be spent for political party purposes. RCW 42.17.640(14) states:
The following contributions are exempt from the contribution limits of this section:
(a) An expenditure or contribution earmarked for voter registration, for absentee ballot information, for precinct caucuses, for get-out-the-vote campaigns, for precinct judges or inspectors, for sample ballots, or for ballot counting, all without promotion of or political advertising for individual candidates; or
(b) An expenditure by a political committee for its own internal organization or fund raising without direct association with individual candidates.
In the 1996 electoral cycle, the WSRP used the exempt contributions it had accepted under RCW 42.17.640(14), commonly referred to in political circles as "soft money," to pay $150,000 toward the production and airing of a television advertisement critical of Gary Locke, the Democratic candidate for governor that year. In fact, 98 percent of the soft money received by the party used to purchase the advertisement in question came from organizational contributors whose contributions to the party were subject to the limitations of RCW 42.17.640(6). The advertisement ran just a few weeks before the gubernatorial election. In addition, the WSRP paid $30,000 for another advertisement in the same time period that was essentially identical to the WSRP's soft money advertisement.
The trial court here found the soft money advertisement to be issue advocacy. The trial court found RCW 42.17.640(14) to be constitutional by implying an issue advocacy exception, permitting the WSRP to receive soft money contributions and expend them for the alleged issue advocacy present in this case.
Although campaign contribution limits are subject to strict scrutiny by the courts, Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Nixon v. Shrink Mo. Gov't PAC, 520 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); Young Ams. for Freedom, Inc. v. Gorton, 83 Wash.2d 728, 522 P.2d 189 (1974), courts have also discerned a compelling state interest in legislation that bars corruption or the appearance of corruption in the electoral process. That compelling state interest constitutionally justifies statutory limitation of campaign contributions. Buckley, 424 U.S. at 25-26, 96 S.Ct. 612. Specifically, limitations on contributions to organizations that in turn expend money independently of candidates are upheld because such activities may circumvent the permissible constitutional policy limiting contributions to candidates. See Buckley, 424 U.S. at 80, 96 S.Ct. 612; Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 248-49, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). However, contribution and expenditure restrictions may not apply to issue advocacy, that is, political speech relating to issues rather than speech for or against specific candidates. See, e.g., Federal Election Comm'n v. Christian Action Network, 894 F.Supp. 946 (W.D.Va.1995), aff'd, 92 F.3d 1178 (11th Cir.1996); Maine Right to Life Comm., Inc. v. Federal Election Comm'n, 914 F.Supp. 8, aff'd, 98 F.3d 1 (1st Cir.1996), cert. denied, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997).
*835 The majority disagrees with the trial court's approach to this case. The majority holds both RCW 42.17.640(6) and (14) are unconstitutional and severs both sections of the statute from the remainder of the text. In so doing, the majority eliminates any limitation on soft money contributions to a party organization in Washington so long as the contribution is used for what the majority loosely calls issue advocacy. So much for Initiative 134's limits on soft money.
The majority asserts, "our conclusion that the advertisement in question is issue advocacy necessarily means that RCW 42.17.640 is unconstitutional insofar as it restricts the expenditure for the ad," Majority op. at 824, and goes on for many additional pages to explain why the statute is unconstitutional.
The majority argues with itself for those additional pages. This soliloquy is entirely unnecessary. The trial court did not find the statute unconstitutional nor do the parties argue the statute is unconstitutional. In fact, the WSRP specifically requested we not find the statute unconstitutional, offering two arguments as to why. Br. of Resp't at 34-36. Yet, even still the majority opinion goes on to engage the WSRP in argument over whether the statute is unconstitutional, pointing out the WSRP's errors. Majority op. at 827-828.
This lengthy excursion by the majority violates many of our decisional rules. First, when a party does not argue a statute is unconstitutional, the question is not properly before us. We customarily allow parties to run their own cases without arguing with them about why their tactical decisions may be wrong. Issuing a decision declaring a statute unconstitutional would be to render an advisory opinion. Here no controversy exists between the parties on the constitutionality of the statute, and so it is inappropriate for us to issue an opinion on it. As we said in Washington Beauty College v. Huse, 195 Wash. 160, 164-65, 80 P.2d 403 (1938):
It should be remembered that this court is not authorized to render advisory opinions or pronouncements upon abstract or speculative questions under the declaratory judgment act. The action still must be adversary in character between real parties and upon real issues, that is, between a plaintiff and defendant having opposing interests, and the interests must be direct and substantial and involve an actual as distinguished from a possible or potential dispute, to meet the requirements of justiciability.
Second, "[w]herever possible, it is the duty of this court to construe a statute so as to uphold its constitutionality." State ex rel. Herron v. Browet, Inc., 103 Wash.2d 215, 219, 691 P.2d 571 (1984). See also In re Well, 133 Wash.2d 433, 946 P.2d 750 (1997); see Swanson v. White, 83 Wash.2d 175, 183, 517 P.2d 959 (1973). We can easily construe RCW 42.17.640(14) upholds its constitutionality by deciding, as the trial court did, that the statute does not apply to issue advocacy. Such a conclusion follows naturally from the wording of the statute, which specifically prohibits the spending of soft money for the "promotion of or political advertising for individual candidates." The logical corollary to that wording is the obverse proposition that the spending of soft money for the advertising of issues, rather than individual candidates, is not prohibited. That was the conclusion of the trial court and is the position of the parties on appeal.
The majority tells us, however, that the trial court's conclusion is "disingenuous,"[2] Majority op. at 828, and that the trial court and the parties are wrong, even though nobody else makes the majority's argument. For instance, the majority says at page 825, "Nor does the fact that a political party is the speaker extending funds for issue advocacy mean that issue advocacy may be regulated." This may very well be correct, but nobody in this case argues issue advocacy may be regulated. Only the majority feels compelled to decide the statute regulates issue advocacy, enabling the majority then to declare the statute unconstitutional. The majority erects a straw man for the sole purpose, it seems, of smiting it down.
I believe the trial court properly construed RCW 42.17.640(14) to require an exemption *836 for issue advocacy. The majority would have us believe the people of the state of Washington enacted Initiative 134 with the idea that contribution limitations were proper, but such contribution limits could readily be circumvented by political parties' spending contributions under the guise of issue advocacy. Such an interpretation defies logic. As even the WSRP argued, the trial court was correct in implying an issue advocacy exemption to RCW 42.17.640(14). I would affirm the trial court and hold RCW 42.17.640(14) constitutional if that statute is read to exempt contributions expended for issue advocacy.
Turning next to the question of whether the advertisement at question here was issue advocacy, I believe the trial court erred. Plainly, where the advocacy calls specifically for a vote for or against a candidate, candidate advocacy is involved. But campaign activities are seldom so clear cut. Properly considered, the WSRP's advertisement was express advocacy that all agree would violate the law.
The majority discusses two advertisements, the "Tell Gary Locke" advertisement and another advertisement it says is express advocacy. It is useful to look at both advertisements side by side.

------------------------------------------------------------
SO-CALLED "ISSUE ADVOCACY" "EXPRESS ADVOCACY" AD
AD
------------------------------------------------------------
Video: b/w photo of Locke, Video: b/w photo of Locke,
pushing in. Voice-over: pushing in. Voice-over:
------------------------------------------------------------
What does Gary Locke What does Gary Locke
have to say about crime in have to say about crime in
our neighborhoods? our neighborhoods?
------------------------------------------------------------
When 76% of voters said When 76% of voters said
yes to "three strikes, yes to "three strikes,
you're out," Gary Locke you're out," Gary Locke
said no. said no.
------------------------------------------------------------
When people asked for When people asked for
more cops on the streets more cops on the streets
in King County, Gary in King County, Gary
Locke said no. Locke said no.
------------------------------------------------------------
But, Gary Locke said But, Gary Locke said
"yes" to a plan which "yes" to a plan which
would give self-esteem would give self-esteem
training to prostitutes and training to prostitutes and
pay for a newsletter for pay for a newsletter for
those employed in the those employed in the
"sex industry," a plan so "sex industry," a plan so
ridiculous that both Republicans ridiculous that both Republicans
and Democrats and Democrats
condemned it. condemned it.
------------------------------------------------------------
Tell Gary Locke that's not And now he wants to be
what we call getting tough your governor?
on crime.
------------------------------------------------------------
Tell Gary Locke that we Gary Locke:
deserve better.
------------------------------------------------------------

The majority says of the advertisement on the left, "The question is not whether the `Tell Gary Locke' commercial is susceptible to a reasonable belief it called for a vote against Locke, but whether it is susceptible only to an interpretation that it called for such a vote." Majority op. at 823. The majority says:
[I]f a voter intending to vote for Gary Locke in the gubernatorial election watched the "Tell Gary Locke" commercial, that voter could (1) change his or her vote; or (2) contact Gary Locke to inform him that he or she disagrees with his stance on crime, but cast his or her vote for Gary Locke nonetheless. Alternatively, a viewer might agree with Gary Locke's stance on crime, and could choose to vote for him on the basis of the commercial. So long as the ad does not constitute an exhortation to vote for or against a specific candidate, however, it is not express advocacy.
Id. at 822. The majority concludes this commercial was not express advocacy because it was not a "direct exhortation to the public" to vote against Locke. Id. at 823.
As to the second advertisement, the majority says:
The second ad was clearly express advocacy because unlike the "Tell Gary Locke" ad, it explicitly exhorted the hearer to vote against a particular candidate. The ad said with regard to Gary Locke: "And now he wants to be our governor? Gary Locke: another extreme liberal we just can't afford." ... With this language the second advertisement is susceptible to no other reasonable interpretation than as an exhortation to vote for or against a candidate.
Id. at 823. I beg to differ. The words, "And now he wants to be your governor?" are not an exhortation to vote at all; they simply form a question that can be truthfully answered only one way. Those words are hardly different in intended effect from the words the majority says are pure issue advocacy: "Tell Gary Locke that we deserve better." Yet the majority, looking through its *837 curious prism, concludes the latter sentence is not an exhortation to vote and the former sentence is. This makes no sense. Both advertisements were designed to persuade voters not to vote for Gary Locke for governor, and that is express advocacy.
True issue advocacy would not have focused on candidate Locke at all. A true issue advocacy advertisement might have said, "More Republicans supported the three strikes initiative than Democrats. If you agree we should be tough on crime, vote for Republicans this fall." Both of the advertisements in this case, on the other hand, are unmistakable, explicit exhortations to vote against Gary Locke. Surely any sentient member of the public who saw these commercials would have understood these were anti-Gary Locke advertisements paid for by the Republican Party for the express purpose of urging voters not to vote for him.
In Federal Election Comm'n v. Furgatch, 807 F.2d 857, cert. denied, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987), the United States Court of Appeals for the Ninth Circuit addressed candidate advocacy and noted the question must be analyzed not with resort to magic words but with an eye to the entire context in which the communication took place. The court suggested the timing of the communication, as well as the effect of the communication, must be examined as part of the analysis. This interpretation represents a commonsense appreciation for the reality of political campaigns where every effort is made to circumvent the rules of the game.
Applying the Furgatch context rule to the communication at bar, it is plain the WSRP engaged in candidate advocacy, urging the defeat of candidate Gary Locke. In fact, in oral argument before this Court, counsel for the WSRP conceded the advertisements, both the soft money and hard money variety, were designed to influence the outcome of the gubernatorial election. The text of both advertisements in this case was essentially identical. The tag lines, calling for action by the listeners or viewers of the advertisement, were remarkably similar. The advertisements were placed in the heat of the gubernatorial campaign, just a few weeks before the election. These advertisements were meant to advocate the defeat of the Democratic candidate for governor, no more, no less. They did not discuss in detail the WSRP's view on issues at a time when the voters had an opportunity to reflect on the issues. Ordinary citizens, unlearned in the law, would have no trouble discerning these were exhortations to defeat Locke.
Moreover, to assert the advertisements were "uncoordinated" is to defy reality. A soft money advertisement, whose text was so similar, was obviously connected with the hard money advertisement (an in-kind contribution by the WSRP to the Republican candidate for governor). Although the record is silent on this point, it is not difficult to believe the same advertising firm prepared both advertisements, and both advertisements were likely placed with television stations in locations in the state of Washington for a coordinated purpose. It is premature to determine on summary judgment that this was an uncoordinated campaign effort by the WSRP, designed to defeat the Democratic candidate for governor, violating the statutory restrictions of RCW 42.17.640(6) and (14).
The majority opinion represents another example of this Court's willingness to find a basis upon which to invalidate virtually any regulation of political campaign process in Washington. Our case law in this context presents an extreme view of the First Amendment that suggests "anything goes." We have held deliberate lies in political campaigns go beyond the reach of government regulation on First Amendment grounds. See State ex rel. Public Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 957 P.2d 691 (1998) (overturning statute banning deliberate lies in political campaigns). We have held legislative caucuses may engage in political fund raising during legislative sessions when special interest influence on law making is most pronounced. Senate Republican Campaign Comm. v. Public Disclosure Comm'n, 133 Wash.2d 229, 943 P.2d 1358 (1997) (lifting Initiative 134's ban on fund raising by caucuses during legislative sessions). Now, we hold contributors may circumvent the contribution limits of Initiative 134 by making unlimited contributions to political party organizations under an extraordinarily *838 loose definition of issue advocacy. The Court's naivete, or cynicism, regarding campaign process and electoral politics is painful.
Rather than exhibiting the courage of its First Amendment convictions and holding all of Initiative 134 restrictions on political contributions unconstitutional, the majority delivers the "death by a thousand cuts" to Initiative 134 and campaign reform legislation. The entirety of the Initiative may be rendered unconstitutional if the fundamental building blocks of its rationale and its effect are removed, as the majority has accomplished by its interpretation of the statute here. If the majority truly believes anything goes in campaign financing, it should say so and adopt the straightforward rationale of amicus American Civil Liberties Union that any limit on campaign spending activity violates article I, section 5 of the Washington Constitution.
The First Amendment mandates a compelling state interest before regulation of political speech may take place. This is as it should be because political speech is indeed a core aspect of the First Amendment. We must be exacting in our scrutiny of any legislation purporting to regulate such speech. But judges in their cloistered setting, apart from the rough and tumble of real live partisan politics, are apparently unaware of the extraordinary influence of money on the political conversation today. Enormous sums of money committed to political consultants, media experts, and the purchase of media time all too often serve to drown out the voice of individuals in our political system. More and more often, our fellow citizens turn away from the political process, disgusted by the inability of their voices to be heard as against the voices of powerful interests who can buy time in the media to disseminate their views. We run the risk of the voice of the people being drowned out by the voices of those who can purchase access to the ubiquitous media in our society. The compelling state interest here is an electoral process that is not corrupted by, or appears to be corrupted by, moneyed interests who can dominate the establishment of the political agenda and the consequent public discussion of issues. First Amendment free speech in the political context means very little if only moneyed interests can buy access to the means of communication. First Amendment free speech must not be a right solely of those who can afford media access, and only a theoretical interest of those who cannot. To paraphrase Anatole France, the First Amendment, in its majestic equality, permits the rich and the poor alike to participate equally in the political process by allowing all to buy as much media time as they can afford.[3]
I would affirm the trial court's holding that RCW 42.17.640 does not apply to issue advocacy, but would reverse the trial court's holding that the "Tell Gary Locke" commercial was issue advocacy as a matter of law, and remand this case for a trial on that question.
SHIELDS, J.P.T. concurs.
IRELAND, J. (concurring in the dissent).
I concur in Justice Talmadge's dissent. I would affirm the trial court's ruling, which inferred an exception within RCW 42.17.640 for protected free speech with respect to issue advocacy, because it is consistent with statutory rules of construction and is not as chilling as the majority's declaration of unconstitutionality. Normally, this court is extremely reluctant to declare an initiative of the people unconstitutional, whether on its face or as applied. See State v. Thorne, 129 Wash.2d 736, 769-70, 921 P.2d 514 (1996) (this court upheld constitutionality of "Three Strikes" initiative despite barrage of constitutionally based challenges). This presumption of constitutionality should remain even more steadfast where neither party requests a declaration of unconstitutionality, as was the case here. Br. of Resp't at 34-35 ("The WSRP [Washington State Republican Party] does not want § 640(14) declared unconstitutional.").
*839 However, while I would affirm the trial court's legal analysis, I, too, would remand for trial. Whether the ad in question was "issue advocacy," or whether both ads, when considered together, resulted in a forbidden "coordinated purpose" that advocated for or against a particular candidate, were questions the jury should have been given an opportunity to decide.
NOTES
[1] While the Commission may impose a penalty of not more than $1,000 per violation under RCW 42.17.395(4), the civil penalties sought in court by the Attorney General may be $10,000 or three times the amount of the illegal contribution, whichever is greater. RCW 42.17.390(3).
[2] The parties have not raised any issues under the Washington State Constitution. Amicus Curie American Civil Liberties Union of Washington urges this court to decide this case on independent state constitutional grounds. Generally, claims raised only by amicus are not considered. Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 827, 854 P.2d 1072 (1993). Accordingly, we decide the constitutional issues in this case under the United States Constitution.
[3] In McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court has made it clear that "core political speech need not center on a candidate for office. The principles enunciated in Buckley extend equally to issue-based elections...."
[4] The Court has recently confirmed that this standard, and not strict scrutiny, applies in the case of contribution limits. Nixon v. Shrink Missouri Gov't Political Action Comm. (PAC), ___ U.S. ___, ___, 120 S.Ct. 897, 145 L.Ed.2d 886, 2000 WL 48424, at *7 (2000); see also Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("[w]e have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending") (plurality opinion joined by O'Connor, J., concurring, constituting a majority of the Court).
[5] The Court has recently explained that corruption which is the equivalent of bribery is not the only corruption which justifies limits on contributions to candidates. The perception of corruption inherent in a regime of large individual financial contributions to candidates raises a concern almost equal to that of quid pro quo corruption. Nixon v. Shrink Missouri Gov't Political Action Comm'n, ___ U.S. ___, ___, 120 S.Ct. 897, 145 L.Ed.2d 886, 2000 WL 48424, at *9 (2000).
[6] This distinction was addressed later in Buckley when the court examined FECA's disclosure requirements for independent expenditures and concluded they "share[d] the same potential for encompassing both issue discussion and advocacy of a political result" as former 18 U.S.C. § 608(e)(1). Buckley, 424 U.S. at 79, 96 S.Ct. 612. The Court said that compelled disclosure can infringe on First Amendment rights, and said:

To insure that the reach of § 434(e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of § 608(e)to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.
Id. at 80, 96 S.Ct. 612 (footnotes omitted). The Court then upheld the constitutionality of § 434(e)'s independent reporting requirements, as narrowly construed, because of the government's informational interest in increasing the fund of information concerning those who support candidates.
[7] As noted at the outset of this opinion, the amounts stated in the statute are subject to adjustment for inflation.
[8] RCW 42.17.020(14)(a)(ii) provides that a contribution includes "[a]n expenditure made by a person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a political committee, or their agents...."
[9] The communication in question in Massachusetts Citizens for Life, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539, was held to be express advocacy subject to FECA's absolute prohibition of direct expenditure of corporate funds in connection with any election. This prohibition is an exception to Buckley's rule that independent expenditures may not be limited. See infra note 11. However, the Court in Massachusetts Citizens held that as applied to the nonprofit corporation involved, the provision was unconstitutional.
[10] The Commission has also failed to present a sufficient factual basis for its claim that the funds used consisted largely of organizational contributions. The only source for the factual claim is a declaration stating that 98 percent of the funds in the Party's exempt account during the 1996 election cycle were from contributors subject to limits under RCW 42.17.640(6), and that the largest contributor was the National Party. Clerk's Papers (CP) at 376 (Declaration of Susan Harris). However, aside from the fact that this declaration does not identify the funds used for the "Tell Gary Locke" advertisement itself, the declaration was never before the trial court when it ruled on the motion for summary judgment, see CP at 344-45, but was instead submitted on the Party's motion for reconsideration, which was denied, CP at 387-88 (mistitled as an order granting motion for reconsideration).
[11] Independent expenditures by a corporation from its general treasury may be prohibited under the First Amendment. A state statute may permit such expenditures to be made only from a special segregated fund to which voluntary contributions have been made. While expenditure of corporate funds to support a political candidate is protected core political speech, a compelling governmental interest in preventing corruption supports the restriction of political funding channeled through the corporate form. The state's interest in foreclosing the corrosive and distorting effects of immense aggregation of wealth amassed through the corporate form under favorable state laws respecting corporations, which has little or no relation to the public's support for the corporation's political candidate, is a compelling interest which justifies the restriction. See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). In contrast, this rationale does not apply in the case of certain nonprofit corporations formed for the express purpose of promoting political ideas and not engaging in business activities, having no shareholders or persons in a similar position having claims to the assets of the corporation, and which are independent from the influence of for-profit corporations. See Austin; Massachusetts Citizens for Life, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539.
[12] The Party does not argue that the "Tell Gary Locke" advertisement is an independent expenditure. Even if the ad did expressly advocate the defeat of Locke, however, we have grave doubts that the expenditure could be restricted to nonexempt, limited contributions. Initially, there is no factual question about whether the expenditure was coordinated with a candidate. The ad was not coordinated. Further, a reviewing court may not presume coordination between a candidate and a political party. Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 620-22, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality); Id. at 627, 116 S.Ct. 2309 (Kennedy, J. concurring in part, dissenting in part).

Under Buckley independent expenditures cannot be limited. However, contributions to candidates can be, and thus Buckley permits a scheme where a candidate can used aggregated limited contributions to make unlimited expenditures.
The United States Supreme Court held in Colorado Republican that political parties, like individuals and other groups, can make independent expenditures which cannot be limited. However, the Court has never addressed the issue whether contributions to a political party may be limited. Arguably, the corruption rationale does not apply in the context of contributions to political parties. See James Bopp, Jr., Constitutional Limits on Campaign Contribution Limits, 11 Regent U.L.Rev. 235, 294-95 (1999) (a candidate's change of position because of pressure from his political party does not constitute corruption but is instead an example of a candidate responding to the wishes of a broad cross-section of constituents as reflected by the party; limitation on contributions to political parties does not serve the purpose of preventing corruption); Richard Briffault, Campaign Finance, The Parties and the Court: A Comment on Colorado Republican Federal Campaign Committee v. Federal Elections Commission, 14 Const. Comment. 91, 98 (1997) (a contribution to a political organization or intermediary for election-related purposes is arguably neither a contribution nor an expenditure within the Buckley analysis; given the lack of a direct tie between the donor and the candidate, a contribution may not present the vice the Court in Buckley found in contributions). Accordingly, a good argument can be made that contributions to political parties may not be limited.
[13] Campaign finance reform is advocated by many, and a casual search will locate numerous articles calling for overturning Buckley or reconstruing the First Amendment. E.g., David Schultz, Revisiting Buckley v. Valeo: Eviscerating the Line Between Candidate Contributions and Expenditures, 14 J.L. & Pol. 33 (1988); Richard Briffault, Issue Advocacy: Redrawing the Elections/Politics Line, 77 Tex. L.Rev. 1751 (1999). Some authors go the other way, and advocate even less restriction on campaign financing than Buckley upheld. E.g., Kathleen M. Sullivan, Against Campaign Finance Reform, 1998 Utah L.Rev. 311 (1998). Although the debate is intense, Buckley's First Amendment analysis remains the standard.
[14] An "as applied" challenge occurs where a plaintiff contends that a statute's application in the context of the plaintiff's actions or proposed actions is unconstitutional. If a statute is held unconstitutional as applied, it cannot be applied in the future in a similar context, but it is not rendered completely inoperative. A statute is rendered completely inoperative if it is declared facially unconstitutional. However, a facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied. See In re Detention of Turay, 139 Wash.2d 379, 417 n. 28, 986 P.2d 790 (1999).
[15] RCW 42.17.400(5) provides in relevant part that "[i]n any action brought under this section... [i]f the defendant prevails, [the defendant] shall be awarded all costs of trial, and may be awarded a reasonable attorney's fee to be fixed by the court to be paid by the state of Washington."
[16] 42 U.S.C. § 1983 (1994) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
[17] However, suits for injunctive relief are not barred. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Section 1983 suits against the state and "arms of the state" generally may not be brought in federal court because the Eleventh Amendment bars such suits, unless Eleventh Amendment immunity has been waived. See Quern v. Jordan, 440 U.S. 332, 340-41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).
Suits against local governments are not barred, as they are "persons" under § 1983. Monell v. Department of Soc. Servs., 436 U.S. 658, 659, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[1] The WSRP was a supporter of Initiative 134 in 1992. Then-State Senator Linda Smith was also a prime advocate of the Initiative and its purposes, a position she continued to advocate later in Congress, much to the displeasure of her colleagues. Ironically, the WSRP now seeks invalidation of the Initiative it once championed.
[2] Among the synonyms for the word disingenuous are insincere, untruthful, hypocritical, deceitful, devious, and dishonest. The majority ought to be able to disagree with Judge McCullough without insulting him.
[3] Anatole France satirized formal legal equality by stating the poor "must labour in the face of the majestic equality of the law, which forbids rich and poor alike to sleep under the bridges, to beg in the streets, and to steal their bread." ANATOLE FRANCE, THE RED LILY 75 (1917 ed.) (1894).